UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                   :       Chapter 13

JOHN R. CLANCY                          :

     Debtor                           :       Bankruptcy No. 05-12805F

...............................................

MEMORANDUM

...............................................

     E*TRADE Consumer Finance Corporation has filed a motion seeking to terminate the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and (d)(2). The motion is opposed by the debtor, John R. Clancy.[1] At issue is possession and disposition of a luxury recreational vessel known as the "Tool Box." An evidentiary hearing was held, and the following facts were proven.[2]

---

[1] After hearing all of the evidence, William C. Miller, Esquire, the standing chapter 13 trustee, had no opposition to granting E*TRADE relief from the automatic stay.

[2] In its post-hearing memorandum, E*TRADE refers to information that the debtor allegedly provided at a meeting of creditors held after the hearing on the instant motion. Such alleged information is not part of the evidentiary record and cannot be considered. See generally In re Millman, 2003 WL 716289, at *3 n.12 (Bankr. E.D. Pa. 2003); In re MacDonald, 222 B.R. 69, 72 (Bankr. E.D. Pa. 1998); In re Midway Airlines, Inc., 221 B.R. 411, 462-63 (Bankr. N.D. Ill. 1998).

     Furthermore, during the hearing, the secured creditor sought to offer in evidence a declaration made by one of its employees. The debtor's objection to the admission of this document was sustained, pursuant to Fed. R. Bankr. P. 9014(d). Subsection (d) was added to the procedural rule in 2002 to make clear that one party in a contested matter cannot present evidence of disputed factual issues without affording the other party with the opportunity for cross-examination of witnesses, unless there is no objection. See Advisory Committee Note (2002); see generally In re Engage, Inc., 315 B.R. 217, 224 (Bankr. D. Mass. 2004).

I.

On or about May 10, 2001, the debtor became the owner of a 2001, 34-foot Luhrs Convertible powerboat called the "Tool Box." In connection with his ownership of this vessel, the debtor granted a first preferred ship mortgage to Ganis Credit Corporation in the amount of $139,700. Ex. M-1. E*TRADE is the successor in interest to Ganis. The debtor testified that the mortgage was to be repaid in 240 monthly installments of $1,178.[3]

The debtor is self-employed and operates the John Clancy Construction Company. The Tool Box is used by him for recreational purposes only. Although title to the vessel is only in the name of the debtor, Mr. Alan Mancill also uses the powerboat and assisted in its maintenance and with certain expenses.

Around October 2004, the debtor became delinquent in loan repayments to E*TRADE, and the latter sent him a delinquency notice in January 2005. In addition, insurance on the vessel had lapsed and the debtor was in arrears in his marina storage fees. The debtor, seeking to rectify his loan delinquency, sent a business check to E*TRADE dated January 30, 2005. Ex. D-1. For reasons not explained, the check was not negotiated and the vessel was repossessed on or about February 15, 2005.

---

[3]The movant did not offer in evidence the underlying note, and the mortgage itself is silent as to the number and amount of monthly payments.

At the time of its repossession, the vessel was located at a marina in Maryland.[4] E*TRADE had the powerboat taken to Connecticut, where it is presently located.

The debtor and Mr. Mancill maintain that the boat was purchased at a price lower than its market value, because Mr. Mancill offset some of the purchase price with a warranty claim he had against the manufacturer, involving another vessel. (The debtor also paid $25,000 as a deposit at the time of purchase.) They contend that the present value of the powerboat is $230,000. See United States v. 68.94 Acres of Land, 918 F.2d 389, 397 (3d Cir. 1990) (owner of property is competent to testify as to its value). E*TRADE asserts that the vessel is worth approximately $140,000. Ex. M-6. E*TRADE further alleges that it is still owed about $140,634.76. Motion, ¶ 8.

The debtor disputes that E*TRADE's valuation of the powerboat is accurate, because the NADA appraisal guide—upon which the creditor relies exclusively[5]—refers to a 310 HP gasoline engine. The Tool Box has a more powerful twin diesel engine, an engine that both Mr. Mancill and the debtor maintain adds

---

[4]The mortgage, at 2 ¶ 8, restricts the permissible location of the vessel, referring to a document called the "Borrower's Acceptance of Vessel." That document was not offered in evidence. However, the creditor did not complain that the vessel was improperly docked at the marina in Maryland, and the mortgage contains an acknowledgment signed by a notary public in the State of Maryland. Moreover, the temporary insurance binder, Ex. D-3, identifies the "certificate holder" as the Sunset Marina in Ocean City, Maryland. Thus, I conclude that Maryland law, along with federal law, governs the debtor's and creditor's rights regarding the repossession and disposition of the Tool Box. See Key Bank of Maine v. Dunbar, 1995 WL 541778 (E.D. Pa. 1995).

[5]Although an owner of property is competent to testify as to its value, a court need not accept that valuation over expert testimony offered by the opposing party. See United States v. 7.92 Acres of Land, 769 F.2d 4, 12 (1st Cir. 1985). Here, the secured creditor offered no such testimony.

3

considerably to its value. In corroboration thereof, the debtor offered in evidence (without objection) copies of web pages from YachtWorld.com. These pages list twin diesel engine 34-foot Luhrs Convertible boats for sale. The prices range from $199,900 for a model year 2000 vessel, to $229,000 for a model year 2002 vessel. Ex. D-5.

Based upon the testimony offered and the documents presented, I conclude that, for purposes of this contested matter, the fair market value of the vessel is approximately $220,000; or about $80,000 more than E*TRADE is owed.

In this chapter 13 case, the debtor has proposed a reorganization plan under which the debtor will tender $750 per month to the trustee for three years. Ex. D-4. He further proposes to tender all postpetition monthly payments due to E*TRADE and cure the pre-bankruptcy delinquency as a portion of these plan payments. The plan expressly provides that allowed claims of unsecured creditors will be paid in full. Ex. D-4.

Finally, the debtor offered evidence of a temporary insurance binder for the vessel issued by Travelers Insurance Company, inter alia, in the amount of $235,000 for "Hull Coverage" (with a $2,350 deductible) with E*TRADE as the loss payee. Ex. D-3. The debtor testified that he paid the annual premium for this insurance coverage, and offered a copy of the premium check in evidence. Ex. D-6. Thus, the vessel was likely covered by insurance at the time of the hearing.

II.

A.

As I noted at the outset, E*TRADE holds a security interest on the debtor's vessel and is now seeking relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and (d)(2) in order to sell the powerboat in a commercially reasonable manner, as permitted by state law. Motion, ¶ 11.

Subsection 362(d)(1) provides that relief from the automatic stay can be granted for "cause" shown, including a lack of adequate protection for a creditor. As a general principle, whether to modify, condition or annul the bankruptcy stay under section 362(d)(1) is committed to bankruptcy court discretion, see generally Matter of Holtkamp, 669 F.2d 505 (7th Cir. 1982); In re Shariyf, 68 B.R. 604 (E.D. Pa. 1986), and is to be determined by examining the totality of the circumstances. See Matter of Baptist Medical Center of New York, Inc., 52 B.R. 417, 425 (E.D.N.Y. 1985), aff'd, 781 F.2d 973 (2d Cir. 1986).

Alternatively, relief from the bankruptcy stay under section 362(d)(2) requires a two-part analysis. Subparagraph(A) of section 362(d)(2) requires a showing that there is no equity in the collateral; that is, a showing that the value of the collateral is less than the sum total of all of its liens. See, e.g., In re Indian Palms Associates, Ltd., 61 F.3d 197, 206 (3d Cir. 1995) ("The classic test for determining equity under section 362(d)(2) focuses on a comparison between the total liens against the property and the property's current value"); In re Liona Corp., N.V., 68 B.R. 761, 766 (Bankr. E.D. Pa. 1987); In re Jug End in the Berkshires, Inc., 46 B.R. 892, 901 (Bankr. D. Mass. 1985).

5

The party seeking relief from the stay has the evidentiary burden of demonstrating lack of equity. 11 U.S.C. § 362(g)(1); In re Liona Corp., N.V., 68 B.R. at 766. If the moving party proves a lack of equity, then the party opposing the termination of the stay has the burden of demonstrating that the collateral is necessary for a plan of reorganization "that is in prospect" within a reasonable time. 11 U.S.C. § 362(d)(2)(B), (g)(2); United Savings Associates of Texas v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365 (1988).

Accordingly, unless the secured creditor demonstrates a lack of equity, a court does not reach the reorganization issue posed by subparagraph (d)(2)(B). See, e.g., In re Kaplan, 94 B.R. 620, 621 (Bankr. W.D. Mo. 1989); Matter of Cardell, 88 B.R. 627, 631-32 (Bankr. D.N.J. 1988); In re Skipworth, 69 B.R. 526, 527 (Bankr. E.D. Pa. 1987). This follows because, to a certain extent, Congress implicitly assumed in section 362(d)(2) that if the collateral has measurable value to the estate in excess of lien claims, it can be liquidated and the proceeds used as part of a liquidating plan of reorganization to pay secured and unsecured creditors. Measurable equity, therefore, means that the secured property is likely to be needed in a plan of reorganization, and such reorganization is possible.

Here, E*TRADE has not met its burden of demonstrating a lack of equity in the Tool Box under subparagraph (A) of section 362(d)(2). The vessel's approximate fair market value is about $220,000 and the sole lien claim held by the creditor is about

$140,600.⁶  Therefore, I cannot grant relief from the stay pursuant to section 362(d)(2) and need not consider whether the debtor met his burden concerning his ability to reorganize under section 362(d)(2)(B).⁷  See, e.g., In re Walden Ridge Development, LLC, 292 B.R. 58, 64-65 (Bankr. D.N.J. 2003); In re American Sweeteners, Inc., 1999 WL 1068446, at *7 (Bankr. E.D. Pa. 1999); see generally In re Ward, 837 F.2d 124, 128 (3d Cir. 1988).

As a result, I shall focus on the creditor's assertion that it is entitled to relief in this contested matter by virtue of section 362(d)(1).

B.

E*TRADE contends that cause exists to terminate the automatic stay because this chapter 13 case was filed in bad faith, because the debtor's proposed chapter 13 plan does not offer adequate protection, and because the vessel, upon repossession, ceased to be property of the bankruptcy estate.

---

⁶I will accept, for purposes of this contested matter, that the failure of the debtor to tender all fees due to the marina could result in a lien against the vessel, though not necessarily a lien that would prime a first preferred ship mortgage.  See Midlantic National Bank v. Sheldon, 751 F. Supp. 26 (E.D.N.Y. 1990).  Not only did the evidence reflect that the unpaid marina fee was modest in comparison to the amount due on the mortgage—$3,137.60, Ex. M-4—but the creditor paid that fee when it repossessed the vessel.  Ex. M-4.  Furthermore, E*TRADE has included that sum in computing its present total claim.  Motion, ¶ 8.  Thus, the evidence reflects that the sole lien against the vessel at the time of the hearing was held by E*TRADE in the amount stated above.

⁷In that regard, E*TRADE argues that a recreational boat, per se, cannot be needed for an effective reorganization, citing In re Walters, 188 B.R. 582, 585 (Bankr. E.D. Ark. 1995).  I need not now decide that issue as section 362(d)(2)(B) is not germane to this contested matter.

Distinct from the requirement found in section 1325(a)(3)—that a chapter 13 plan be proposed in good faith—is the requirement implicitly found in section 1307(c) that every chapter 13 case be filed in good faith.  See, e.g., Matter of Smith, 848 F.2d 813, 816 n.3 (7th Cir. 1988); In re March, 83 B.R. 270, 275 (Bankr. E.D. Pa. 1988).  As the Third Circuit has instructed:

> It is clear that Chapter 13 contains no explicit good faith requirement.  Section 1307(c) provides, however, that Chapter 13 petitions may be dismissed "for cause."  11 U.S.C. § 1307(c).  The Seventh, Ninth and Tenth Circuits have held that lack of good faith in filing is sufficient cause for dismissal under section 1307(c). . . .  We agree.
>
> As the Seventh Circuit has noted, however, "good faith is a term incapable of precise definition."  In re Love, 957 F.2d at 1355.  As a result, we believe that "the good faith inquiry is a fact intensive determination better left to the discretion of the bankruptcy court."  Id.  We therefore join the Seventh, Ninth and Tenth Circuits in holding that the good faith of Chapter 13 filings must be assessed on a case-by-case basis in light of the totality of the circumstances. . . . Factors relevant to the totality of the circumstances inquiry may include, among others, the following:
>
>> the nature of the debt . . . ; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996) (citations and footnote omitted).

In determining whether bad faith exists, the bankruptcy court has the discretion to reach the appropriate result in a particular case based upon the totality of the circumstances.  See In re Lilley, 91 F.3d at 496; Matter of Love, 957 F.2d 1350, 1354 (7th Cir. 1992); In re Mazzocone, 180 B.R. 782 (E.D. Pa. 1995).

8

"Misuse of the bankruptcy laws for an improper purpose may constitute grounds for granting relief from the stay." In re Augustus Court Associates, 43 B.R. 352, 354 (Bankr. E.D. Pa. 1984). Thus, if a chapter 13 case is filed in "bad faith," cause exists to grant relief from the automatic stay under section 362(d)(1). See, e.g., In re Can-Alta Properties, Ltd., 87 B.R. 89, 91 (B.A.P. 9th Cir. 1988) (and cases cited); In re Harris, 192 B.R. 334, 337 (Bankr. W.D.N.Y. 1996); Matter of Nelson, 66 B.R. 231 (Bankr. D.N.J. 1986), aff'd without op., 838 F.2d 1207 (3d Cir. 1988).

In this contested matter, E*TRADE maintains that the debtor filed the underlying chapter 13 petition in bad faith because he was solvent at the time of his bankruptcy filing, and because he sought bankruptcy relief solely to prevent the forced sale of his luxury powerboat.

The existence of solvency does not, by itself, demonstrate a bad faith bankruptcy filing. See, e.g., In re Integrated Telecom Express, Inc., 384 F.3d 108, 121 (3d Cir. 2004) ("To be sure, a debtor need not be insolvent before filing for bankruptcy protection."); In re SGL Carbon Corp., 200 F.3d 154, 163 (3d Cir. 1999) ("It is well established that a debtor need not be insolvent before filing for bankruptcy protection."). Nor does the filing of a bankruptcy petition that is designed to prevent the forced sale of property in which the debtor has substantial equity constitute bad faith. See In re Heath, 188 B.R. 17 (Bankr. D.S.C. 1995); In re Goulding Place Developers, Inc., 99 B.R. 493 (Bankr. N.D. Ga. 1989).

Of course, were a debtor to file a chapter 13 petition with an intent to retain ownership of property, but without the right or ability to propose a reorganization plan that

9

could yield such a result, then bad faith may be present.[8] Upon consideration of the evidence presented and relevant state and federal law, and for the following reasons, I conclude that there is a realistic possibility that the debtor could reorganize and retain ownership of his vessel. Thus, I do not find on this evidence that the debtor filed this bankruptcy petition in bad faith.

C.

As noted earlier, the debtor granted the secured creditor a preferred ship mortgage. Congress has enacted the Ship Mortgage Act, 46 U.S.C.A. §§ 31301-31343, and this statute authorizes, inter alia, "preferred mortgages" on vessels. A preferred mortgage is defined as "a lien on the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by the vessel." 46 U.S.C.A. § 31325(a). The Act also enumerates various remedies that the mortgage holder may take upon default by the mortgagor. However, some courts have held that "the Ship Mortgage Act does not prohibit state self-help enforcement procedures when they are authorized by the

---

[8]The secured creditor relies heavily upon In re Lippolis, 228 B.R. 106 (E.D. Pa. 1998) for the proposition that an individual acts in bad faith when filing a bankruptcy petition to stop an involuntary sale of property. Lippolis is distinguishable, however, as that decision addressed an attempt by a terre tenant to use chapter 13 to assume a mortgage and cure the mortgage default, even though the debtor was not the mortgagor and the mortgage was non-asssumable. In essence, the debtor in Lippolis could not reorganize under chapter 13 and provide for the mortgagee's claim.

     Thus, Lippolis stands for the sensible position that an individual who files a chapter 13 petition without any ability to reorganize does so in bad faith. See, e.g., In re Huerta, 137 B.R. 356, 367 (Bankr. C.D. Cal. 1992). Here, as will be discussed, the debtor may possibly reorganize.

underlying contracts." Dietrich v. Key Bank, N.A., 72 F.3d 1509, 1511 (11th Cir. 1996); see First Federal Savings, F.S.B. v. M/Y Sweet Retreat, 844 F. Supp. 99 (D.R.I. 1994).

As E*TRADE observes, the preferred ship mortgage signed by the debtor permitted the secured creditor to repossess the vessel upon default and sell it through a non-judicial sale. Ex. M-1, ¶ 16 at 3. It argues from this provision that, upon repossession, the debtor lost all interest in the powerboat. Maryland state law, which is germane to this dispute for reasons discussed earlier, holds to the contrary.

In Maryland National Bank v. Darovec, 820 F. Supp. 1083 (N.D. Ill. 1993), the district court rejected the mortgagor's argument that the Ship Mortgage Act provided the exclusive mechanisms for repossessing vessels. It found that Maryland law permitted self-help repossession. It also concluded, however, that upon repossession the mortgagor held a state law right of redemption. Id. at 1088-89. Furthermore, under Maryland law, a borrower's right of redemption for personalty continues until the secured creditor has disposed of the collateral, see First National Bank of Maryland v. DiDomenico, 302 Md. 290, 295 (1985), or for 15 days from the date the borrower is informed of the right of redemption. See Maryland Commercial Code, § 12-1021(g).[9] Here, there was no

---

[9] The 15 day right of redemption in section 12-1021, referred to in Darovec, requires only that the borrower:

> 1) Tender the amount due under the agreement at the time of redemption, without giving effect to any provision which allows acceleration of any installment otherwise payable after that time;
>
> (2) Tender performance of any other promise for the breach of which the property was repossessed; and
>
> (3) If the discretionary notice provided for in subsection (c) of this section was given, pay the actual and reasonable expenses of

(continued...)

evidence that the debtor was given notice of his right to redeem the property and the vessel had not been sold at the time this bankruptcy case commenced. Accordingly, the debtor held a property interest in Tool Box powerboat at the time of filing his bankruptcy petition. See United States v. Whiting Pools, Inc., 462 U.S. 198 (1983); In re Canney, 284 F.3d 362 (2d Cir. 2002); In re Nejberger, 934 F.2d 1300, (3d Cir. 1991).[10]

Moreover, 11 U.S.C. § 1322(b)(5) permits a chapter 13 debtor to cure defaults in long-term debts. Although debtors typically utilize this provision to cure delinquencies in residential mortgage obligations, the language of the statutory provision is not so restrictive. See 8 Collier on Bankruptcy, ¶ 1322.09[2], at 1322-31 (15th ed. rev. 2004) ("The right to cure defaults on long-term contracts applies to all long-term debt . . . .").

Since the debtor retained a property interest in the Tool Box at the time he filed his chapter 13 petition, and as his loan obligation to E*TRADE matures many years after the conclusion of his proposed plan, the debtor is permitted to propose a reorganization plan that will cure his loan default within a "reasonable time." Whether the

---

[9](...continued)
retaking and storing the property.

Commercial Code, § 12-1021(h).

The right of redemption referred to in DiDomenico stems from Article 9 of the Uniform Commercial Code and requires repayment of the obligation in full, plus expenses associated with repossession.

[10] The secured creditor suggests that the debtor's right of redemption expired by virtue of section 108(b). Even if I accept that section 108(b) applies to redemption rights, subsection (b) provides that the right to cure extends to the later of 60 days after the bankruptcy petition or the deadline set by non-bankruptcy law. 11 U.S.C. § 108(b); see generally Matter of Sabec, 137 B.R. 659, 669 n.20 (Bankr. W.D. Mich. 1992). E*TRADE does not consider the debtor's redemption right under Maryland state law.

plan proposed by the debtor meets the requirements of section 1322(b)(5) need not be determined in this contested matter. A motion to terminate the bankruptcy stay is not the equivalent of a confirmation hearing. I do conclude, however, that the evidence presented at the hearing suggests that the debtor may be able to propose a viable plan.[11]

Finally, E*TRADE contends that the debtor's plan does not adequately protect its security interest in the Tool Box. I respectfully disagree. Monthly mortgage payments, plus insurance (with the secured creditor as loss payee), plus a $79,400 equity cushion (which cushion is more than 56% of the total claim) does constitute adequate protection.[12] See In re Mellor, 734 F.2d 1396, 1401 (9th Cir. 1984); see generally In re Drebitko, 1992 WL 75156, at *2 (E.D. Pa. 1992) ("An equity cushion, if sufficient in size and unlikely to erode, can, standing alone, constitute adequate protection."). Moreover, the secured creditor also has possession of the vessel.[13]

---

[11] E*TRADE questions the appropriateness of permitting a chapter 13 debtor to reorganize in order to preserve ownership of a luxury vehicle. Typically, however, that issue arises in the context of the disposable income test under section 1325(b). See In re Gibson, 142 B.R. 879 (Bankr. E.D. Mo. 1992). Here, the debtor proposes paying all allowed unsecured claims in full; thus, the disposable income issue would not arise. See generally In re Anes, 195 F.3d 177, 180-81 (3d Cir. 1999); In re Anderson, 21 F.3d 355, 357 (9th Cir. 1994).

[12] The secured creditor unpersuasively attempts to demonstrate that the vessel is depreciating at an amount greater than the monthly payments, by subtracting its current value from its original value and dividing by the number of months since the purchase. Not only does E*TRADE utilize a current market value that is too low, but it assumes a straight-line or constant rate of depreciation. Vehicles depreciate at a greater rate immediately after their purchase; over time, the rate of depreciation decreases.

[13] The debtor has filed an adversary proceeding seeking turnover of the powerboat. If turnover were to be ordered, the creditor would be entitled to adequate protection. See United States v. Whiting Pools, Inc., 462 U.S. 198 (1983); see generally 11 U.S.C. §§ 363(e), 1303. Whether the components of adequate protection for purposes of section 362(d), mentioned in the text above, would also constitute adequate protection under section 363(e), were the debtor to regain possession of the vessel, is an issue that will be addressed in the context of the adversary

(continued...)

Accordingly, E*TRADE has not demonstrated cause to terminate the automatic stay and thus it is statutorily enjoined under 11 U.S.C. § 362(a) from disposing of the vessel. See, e.g., In re Moffett, 356 F.3d 518 (4th Cir. 2004); In re Spears, 223 B.R. 159 (Bankr. N.D. Ill. 1998).

An appropriate order shall be entered.

---

[13](...continued)
proceeding.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                                          :        Chapter 13

JOHN R. CLANCY                                  :

        Debtor                              :        Bankruptcy No. 05-12805F

..............................................

ORDER

..............................................

AND NOW, this 9th day of June 2005, for the reasons stated in the accompanying memorandum, it is hereby ordered that the motion of E*TRADE Consumer Finance Corporation for relief from the automatic stay is denied.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Michael B. McCauley, Esquire
Palmer Biezup & Henderson, LLP
956 Public Ledger Building
620 Chestnut Street
Philadelphia, PA 19106

David A. Scholl, Esquire
Regional Bankruptcy Center of SE PA
Law Office of David A. Scholl
6 St. Albans Avenue
Newtown Square, PA 19073

William C. Miller, Esq.

Chapter 13 Trustee
111 S. Independence Mall
Suite 583
Philadelphia, PA 19106